PROVIDENT INSTITUTION FOR SAVINGS IN JERSEY CITY

*v.*

SISTERS OF THE POOR OF ST. FRANCIS et al.

[Submitted October, 1915. Decided February 5th, 1916.]

1. Where donor was in custody of donee's agents when alleged gift was made, it was donee's duty to produce all testimony obtainable to show donee's competency and the lack of undue influence.

2. The fact that donee's agents who took part in the transaction were not produced as witnesses is entitled to weight.

3. Although a gift made by a feeble person fatally ill may be a gift *inter vivos*, nevertheless being asserted after the death of the alleged donor it is in the same class as gifts *causa mortis* in respect to legal safeguards.

4. Evidence held to show that delivery of a bank book with check was not delivery of the bank book except as a bailment to enable the payee to cash the check.

5. A gift cannot be effected by delivery of a check in an ordinary bank of deposit, for the donor may stop payment of the check.

6. To be effective, it is fundamental that the thing donated must be placed beyond the donor's control.

7. With a rare exception, equity will not aid an incomplete gift.

8. Delivery with donative intent of a check on a savings bank for less than the full amount on deposit with the contemporaneous delivery of the pass book as a bailment to enable the payee to cash the check, does not constitute a completed gift, there being no gift in such case until the check is cashed. The fatal defect consists in the fact that absolute title to and dominion over the pass book as a chattel does not pass to the intended donee.

9. The statute prescribing the form of execution of wills will be rigidly enforced.

On hearing of contesting claimants to fund in savings bank after decree of interpleader.

*Mr. John Milton,* for the Sisters of the Poor of St. Francis.

*Mr. Benjamin A. Vail,* for Benjamin C. Mead, executor.

STEVENSON, V. C.

An old lady, Mrs. Hannah L. Bowdoin, eighty-six years of age, died in the hospital in Jersey City kept by one of the claimants, the Sisters of the Poor of St. Francis, on the 9th day of September, 1914. The day before she died, when she was in a feeble condition of body and mind, she gave a check upon her savings bank account with the Provident Institution for Savings of Jersey City for $3,000 to the claimant the Sisters of the Poor. At the same time she gave a check to her executor and business agent, Mr. Mead, for $2,000. Both of these attempted transfers of money are conceded to have been without any legal consideration, or, in other words, must stand, if they stand at all, as pure gifts. The total amount of the deposit, as Mrs. Bowdoin knew, was $5,700, so that if we deduct the amount of these two alleged gifts from that deposit, there was still $700 left which belonged to Mrs. Bowdoin and passed to her executor upon her decease. Mr. Mead has made no attempt to claim anything upon the check for $2,000, which was given to him, but has included that amount in the item of his inventory which exhibits the amount of money which Mrs. Bowdoin's estate owns on deposit with the Provident Institution for Savings.

1. The main question toward which the testimony offered on each side and the arguments of counsel were directed, was whether this old lady was competent to make this gift, and in fact knew what she was doing, and made the donation without pressure or undue influence of any kind. I recall a considerable number of weighty considerations on each side of this question.

It may be noted in favor of the gift that for all that appears Mrs. Bowdoin had few, if any, relatives dependent upon her; that the gift, or alleged gift, of $3,000 transferred less than an eighth of her estate; that she had been cared for in the hospital of the Sisters of the Poor for some time, and, according to the testimony of her executor and man of business, Mr. Mead, had formed the purpose two or three months before her death of making a suitable donation to the hospital.

On the other hand, Mrs. Bowdoin was eighty-six years of age, and although she talked about making a gift from time to time through a period of some months, she did not take measures to effect such gift until she was in an extremely feeble condition, in fact, on her dying bed, the day before her death. Mrs. Bowdoin also was in the custody and under the control of the active agents of the alleged donee and her memory had greatly failed. The circumstances under which this gift was made, made it the duty of the claimant, the donee, to produce all the testimony obtainable to show that Mrs. Bowdoin was competent to make the gift, and in fact knew what she was doing and acted without undue influence from the agents of the donee. The fact that neither the Mother Superior, nor the other sister who took part in this transaction, was produced as a witness, has weight against the validity of the alleged gift, although reasons, of course, may be surmised why these ladies were reluctant to go upon the stand.

I am glad that I am able to avoid the perusal and study of the entire testimony as written out by the stenographer, in order to answer the questions indicated above, because I am satisfied that under our law of gifts, so far as the same has been declared, no gift of the $3,000 in question was effected, assuming that the alleged donor was competent to make the gift, and in fact acted intelligently and voluntarily when not subjected to any undue influence.

I understand that counsel agree that if this gift was made it was a gift *inter vivos* and not a gift *causa mortis,* notwithstanding the fact that the alleged donor was on her dying bed, and if she understood her condition must have known that she had not long to live. Alleged gifts made by old and feeble persons and persons stricken with fatal illness, if valid, often must be classified as gifts *inter vivos,* nevertheless, being asserted after the death of the alleged donor, they seem to be in many respects in the same category with gifts *causa mortis* in respect of the safeguards and protective conditions which the law should throw around the transaction. There seems to be as much danger in permitting a person to establish a gift *inter vivos* to himself by producing a key or a savings bank book obtained from the deathbed of an alleged donor, as there is in permitting a person under such circumstances to establish a gift *causa mortis.*

Under the facts, as we are now assuming them to be, there can be no question about the donative purpose of Mrs. Bowdoin in giving to this hospital her check for $3,000. While this check was a gratuity, it was also a recognition of the kindness with which she had been treated, and the evidence shows that she had been contemplating making a gift of some sort to the hospital for over two months before this check was delivered. Whether she failed to make up her mind what she would do as an expression of her gratitude, and postponed the determination of the matter until it was too late, is one of the questions the consideration of which I have avoided.

The narrow question which is now under consideration in this case is whether the delivery of the check with donative purpose, and the delivery of the savings bank book in order to enable the payee to cash the check, effected a complete donation. In other words, was the external form of the gift, or attempted gift, sufficient to pass the legal test?

The evidence as to the delivery of the pass book to the representative of the hospital when the check was delivered, or as a part of the same transaction, is meagre, and is rendered more unsatisfactory because the Mother Superior, who received the check, and the other sister who was present, were not put on the stand. The same day when the check was given (September

8th, 1914) a representative of the hospital presented the pass book and check to the savings bank, and thereupon payment was refused, not necessarily, I think, absolutely, but for the time being until investigation could be made. An officer of the bank promptly visited Mrs. Bowdoin at the hospital and testified as to her condition. Mrs. Bowdoin, as stated, died the next day before any further efforts had been made to collect the check.

There can be no possible escape, in my opinion, from the conclusion of fact that no gift of the savings bank book as a chattel was made, or intended to be made, by Mrs. Bowdoin. The title to this book as a chattel remained vested in Mrs. Bowdoin until her death, and then passed to her executor. What Mrs. Bowdoin did, or intended to do, under the facts as we now assume them to be, was to give this check for $3,000 to the Mother Superior with intent that it should be cashed for the benefit of the hospital, and to give or permit the Mother Superior to take the savings bank book in order that the bank might honor the check in accordance with its rules. It was conceded at the argument, whether it appears to have been proved in the evidence or not, that the rule of the bank absolutely required the presentation of the pass book with any check on the account.

In the absence of any evidence to show an intention on the part of Mrs. Bowdoin to vest the title in the pass book as a chattel in the contemplated donee, by delivery of the same, the inference that there was no such intention is unavoidable. Mrs. Bowdoin at the same time when she gave, or attempted to give, $3,000 of her bank account to the hospital, gave, or attempted to give, $2,000 of the same bank account to her business agent and executor, Mr. Mead, and also retained $700. The situation would not have been different, legally, if she had attempted a distribution of $5,000 of this money to fifty different persons in $100 checks, and allowed the donee of the first check to take the pass book. The inference from such a proceeding is absolute, that the intention is that the recipients of the checks shall go together or in succession to the bank and have the use of the pass book for cashing their checks, and after that the pass book is to return to its owner. At most in this case the pass book was lent. There was a mere bailment.

It is well settled that a gift cannot be effected by the delivery of a check upon an ordinary bank of deposit where the drawer's account is good for the amount. The reason is, that until the check is cashed the drawer may stop payment. In such a case the donative purpose may be absolute when the check is given, and ten minutes, or ten hours, or ten days later, at any time before the check has been cashed, such donative purpose may be wholly changed and abrogated. The fundamental principle of the law of gifts is that the gift to be effective must place the thing donated beyond the control of the donor. Where a check on a bank of deposit is given for value, it often operates as an equitable assignment, but such is not the case where a check is given to the payee as a pure donation. *Hopkinson* v. *Foster, L. R. 19 Eq. 74; 3 Pom. Eq. (3d ed.)* § *1284.* See *Ibid.* § *1148 p. 2238 note 3; Beaumont* v. *Ewbank (1902), 1 Ch. 889; Harris* v. *Clark, 3 N. Y. 93.*

While the capacity to acquire property in all lawful ways is a right which all men enjoy, in a narrow sense, it may be said that no one has any legal right to have an intended or attempted gift to him carried into effect. With an exception so rare that it need not be noticed, equity will not aid an incomplete gift. Until a legal gift has been effected so as to vest property in the donee, the only party who has any right calling for consideration in the transaction, is the donor, and that right is a part of the great and sacred right which the law insures to every one under certain limitations and conditions to dispose of his own property in accordance with his own wish and will.

The right to make a will accorded by law is a most valuable right, but the law has in modern times allowed its exercise only under certain very rigid conditions. In the case of gifts *inter vivos* we are dealing with a common law right, but, as heretofore intimated, where the gift is made under circumstances which render it almost inevitable that it will not be inquired into until after the alleged donor's death, it would seem to be advisable that all parties who are contemplating making such donations should be subjected to reasonable limitations.

In my judgment, the delivery of this check on a savings bank with the loan of the pass book, which had to be presented with

the check in order to secure its payment, placed the contemplated donee in precisely the same position that such donee would have occupied if the check had been ·drawn on an ordinary bank of deposit where the account was good and no pass book or other voucher had accompanied the check. It cannot be questioned· in this case that if Mrs. Bowdoin had given a check on an ordinary bank of deposit, no gift would have been effected until the check had been cashed. Nor does it make any difference what may delay or prevent the check from being cashed. It happened in this case that the absolute or conditionai refusal of the bank to pay the check was based upon some information which the bank had received ·in regard to Mrs. Bowdoin's condition or ·her wishes. The situation would have been precisely the same if an accident, such as the loss of the pass book in the street, had prevented the intended donee from presenting the check until after the intended donor's death.

The test question in this case is, Could Mrs. Bowdoin, after delivery of the check and pass book, have stopped payment of the check at the bank and lawfully demanded immediate possession of the pass book? I am unable to perceive any reasonable ground upon which this test question can be answered otherwise than in the affirmative. The brief of counsel in favor of the finality of the gift, after referring to the proposition that in order to establish a valid gift *inter vivos,* "the donor must strip himself of all ownership and dominion over the subject-matter of the gift" (*Swayze* v. *Huntington, 82 N. J. Eq. 127*), proceeds as follows:

"The subject-matter of the gift is not the bank book but the *fund* in the bank. Here· donor drew a check for three thousand dollars and delivered the pass book with the check. What else was required in ₒrder to effectually divest her of ownership and dominion over that sum of money on deposit with the Provident bank?"

The· above argument is based upon the false premise that the delivery of the pass book and check "divested" Mrs. Bowdoin of the $3,000 supposed to be deposited in the bank, or, in other words, divested Mrs. Bowdoin of the right to receive on her own behalf under her contract with the bank, $3,000 of the money ·which the bank was under contract to pay her. The argument

assumes that Mrs. Bowdoin upon delivery of the check and loan of the pass book for the purpose of having it cashed, stripped herself of the power to stop the check and demand back her pass book. The argument also seems to ignore the proposition which counsel quotes from *Swayze* v. *Huntington,* that in cases of this kind the donor must strip himself of *"dominion* over the subject-matter of the gift.". In my opinion there is no transfer, either transient or permanent, of "dominion" over a savings bank account, or any part thereof, when the depositor gives a check on the bank for a part of his account with donative purpose, and lends the contemplated donee the pass book in order to enable him to get the check cashed.

The numerous cases which in comparatively recent times have extended the ancient law of gifts so as to permit the gift of a savings bank book or a life insurance policy, or other non-negotiable contract, to carry and include the money or contract right which the book or instrument so delivered represents, are all based upon the fact that by vesting an absolute title to the voucher, to the savings bank book, for instance, in the donee thereof, with full donative purpose with respect to the fund, the donor has placed the real subject-matter of the gift, which, of course, is the fund, beyond his control forever, and has put the same in the absolute and perpetual control of the donee. *Cook* v. *Lum, 55 N. J. Law 373, 376.* If Mrs. Bowdoin had delivered her pass book, which stood as a voucher controlling $5,700 to the Mother Superior, with the intention of vesting an absolute title to the book in the donee in order that the donee might have absolute dominion over the fund which it represented and thereby become its owner, the gift would have been complete at once—complete and irrevocable. There would have been no *locus penitentiæ.* Ten minutes later if Mrs. Bowdoin had changed her mind and demanded back her book, her demand could not lawfully have been enforced. The situation would have been precisely the same as if Mrs. Bowdoin had delivered a diamond ring to the Mother Superior with intent to effect an absolute donation of the same and later had changed her mind.

This case is in many respects analogous to the one which was presented to the court of errors and appeals in *Keepers* v. *Fidelity Title and Deposit Co., 56 N. J. Law 302,* in which I think our court of last resort in a brief but forcible opinion through Mr. Justice Dixon, intended to call a halt on the modern tendancy to relax the ancient precautions which the older law observed with respect to the recognition of gifts *causa mortis.*

Let us suppose that Mrs. Bowdoin had desired to make an absolute gift—a gift *inter vivos*—of a diamond necklace to an intimate friend, and with ample expressions of donative purpose had delivered to the friend a key to a trunk, not then under her physical control, containing in addition to the necklace a number of other articles belonging to Mrs. Bowdoin. If the friend, the intended donee, takes the key and before Mrs. Bowdoin has made any change of purpose, actually obtains possession of the necklace, immediately upon thus obtaining possession of the necklace the gift becomes complete, but not one moment before. Until such possession had been obtained the gift would be revocable, and after the death of Mrs. Bowdoin the whole transaction would have stood legally as an incomplete gift entirely unenforceable at law or in equity.

I do not recall a single reported case where a gift *inter vivos* of a savings bank account or an amount of money due on a life insurance policy, or other non-negotiable contract, has been sustained in the courts *against the alleged living donor* by proof of delivery of the savings bank book or policy or other instrument which represents the subject-matter of the gift with absolute donative purpose. It is a significant fact that our modern relaxed law has been developed in cases of gifts *causa mortis* or gifts *inter vivos,* which have been for the first time asserted not against the donor but after his death against his estate.

Counsel for the parties in this case who at the request of the court have searched the authorities on the subject, produce no case having authority in New Jersey which controls the present case. Counsel for the alleged donee in his brief states that the "precise question has never been passed upon in this state," but he thinks that authorities which he cites from other states sustain his contention. In regard to some of these authorities

which I have examined, I may say, in the words of Mr. Justice Dixon in the *Keepers' Case,* that I am "not willing to approve the extreme views which have been adopted in the cases cited" (at *p. 308*).

The principal authority cited to sustain a gift of a part of a savings bank account evidenced by delivery of a draft for the amount so intended to be donated, together with the pass book, seems to be *Larrabee* v. *Hascall, 88 Me. 511; 34 Atl. Rep. 408.* Without intimating approval of many of the propositions laid down in this case, it will, I think, be sufficient to deprive the decision of much, if not all, force and influence in this present case, to point out what was the exact state of facts with which the Maine court had to deal. The alleged donor was seventy-two years of age, and at the time of the alleged gift was suffering from his last illness, and the court found that the gift was a gift *causa mortis.* The deceased gave a draft on his savings bank account for $200 and his pass book to the defendant who was nursing him and caring for him. The total deposit was $486.26. When the draft and savings bank book were delivered, deceased said to the defendant: "Take this, Jim, when I am gone, draw the money, put a monument over my brother Stillman's grave and pay my funeral expenses, and the rest is yours." Defendant retained the book and draft until after the donor's decease, then drew the money, paid the funeral expenses, erected the monument and had $12 left for his remuneration. It is not surprising that the administrators of the deceased were not permitted to recover the $200 from "Jim."

It is somewhat difficult to see why the law of gifts was discussed or applied in this case. There seems to have been a contract, and there are also elements of a trust. After full performance of the contract on the part of the defendant without any interference or attempted revocation on the part of the administrators, it would be strange, indeed, if the administrators had been permitted to ignore all the contractual and fiduciary characteristics of the transaction between their decedent and the defendant, and to compel the defendant to pay over to them the $188 which, in pursuance of his engagement with the deceased, he had expended upon the monument and funeral ex-

penses, and also the residue, $12, which the deceased agreed he was to have for his services. All of these expenditures and these services had been rendered by the defendant in reliance upon his possession of the draft and the pass book. The draft or check might be regarded as an equitable assignment because it was not delivered as a gift, but as the consideration of a contract which the defendant performed.

In *Wetherow* v. *Lord, 58 N. Y. Supp. 778,* the donor, when approaching dissolution, "expressed a desire to give to the plaintiff, who was an old friend and had cared for him, the amount of deposit represented by the book," *i. e.,* the amount of a savings bank deposit in the joint names of the donor and his wife "payable on draft of either." The court found that the donor and his wife had an equal interest in the fund, and hence, presumably, they held title to the pass book as joint tenants or tenants in common. The husband with donative purpose signed and delivered to the plaintiff a check for a larger amount than his half of the fund, and also delivered to the plaintiff the savings bank book. There is nothing in the case to show that the donor did not effectually transfer his title to the book to the donee so as to give the donee the same dominion over the fund which the donor theretofore had. Without accepting the main proposition which was reached, I may say that the facts of the case are so different from the one at bar, that no authority can be attributed to it. I cannot discuss in detail the other cases cited by counsel for the Sisters of the Poor, in his elaborate brief, without unduly extending this memorandum. I may say, however, that I have examined all these cases, and I find in them many propositions which as yet have not in any way been recognized as law in New Jersey, and which I am constrained to regard as unsound.

There is a marked contrast between the attitude of our modern law, on the one hand, toward the right to make purely testamentary dispositions of property, and, on the other hand, toward the right to make these *quasi*-testamentary dispositions, which are called gifts *causa mortis,* and the further right to make dispositions which in large numbers of cases in fact are testamen-

tary by gifts *inter vivos* in form, which, however, are not asserted or subjected to hostile examination until after the donor's death. When land was made devisable, according to Blackstone (*2 Com. 376*), "innumerable frauds and perjuries were quickly introduced * * * to remedy which the statute of frauds and perjuries (*29 Car. II. c. 3*) directs" that devises should be in writing signed by the divisor and subscribed in his presence by three witnesses. These safeguards for devises of land were recognized and confirmed in New Jersey by a statute passed in 1713. *Brad. 34; Kin. 46; Pat. 5; Elmer Dig. 594.*

Wills of personal property—testaments—were still left in a dangerously unprotected condition. At length statutes were passed limiting the use of verbal testamentary dispositions of personal property commonly called nuncupative wills. Mr. Paterson's act of 1795 contains these restrictions. *Pat. 189; Elmer Dig. 596.* It is a curious fact that the law of 1795 expressly reserves the right of all persons to make wills of personal property as theretofore provided only that they should be "in writing." Letters, deeds, memoranda of any kind could be probated as wills if the required testamentary purpose could be proved. Only in 1837, in England, and in 1850, in New Jersey (*P. L. 1850 p. 280*), were statutes passed prescribing safeguards for wills of personal property similar to those which had been provided by law for devises of land for two centuries. It may be surmised that most testators had real estate to devise, and hence were obliged to make their wills as prescribed by the statute of frauds. The view expressed by Blackstone (*2 Com. 502*), that "the safer and more prudent way" is to have testaments "signed or sealed by the testator and published in the presence of witnesses" would naturally occur to most testators and their advisors. No doubt, however, the fact that about two hundred years intervened between the statute of frauds protecting devises of land and our present statute of wills protecting testamentary dispositions of personal as well as real property, indicates how slowly the great change in the relative importance of these two kinds of property has taken place and has been recognized.

At present the policy of our law is to enforce rigidly the

statute which prescribes the form of a will of either lands or chattels and the ceremonies necessary for its valid execution.

When we come to examine our law of gifts *causa mortis,* which are in effect a testamentary disposition of personal property, we find that not only has no statute been passed in many states, including New Jersey, safeguarding the transaction against fraud, but the decisions of the courts have even repealed some of the rules and conditions which formerly imposed some protective limitations.

Formerly the *donatio causa mortis,* which was an importation from the civil law, was regarded with disfavor. In 1827, Lord Elden, in the case of *Duffield* v. *Elwas, 1 Bligh (N. S.) 497,* expressed the opinion that it would be an improvement of the law to strike out altogether this peculiar form of gift, and intimated his regret that he was obliged to consider the subject. Chancellor Kent, in discussing gifts *inter vivos,* declares that "if the thing given be a chose in action, the law requires an assignment or some equivalent instrument and the transfer must be actually executed." *2 Kent Com. 439.*

Since the day of Lord Elden and Chancellor Kent, however, the courts seem to have greatly relaxed the limitations and safeguards which originally surrounded both gifts *inter vivos* and gifts *causa mortis,* by extending the theory of effective legal delivery of the subject-matter of the gift so as to make that theory include the delivery of the instrument or voucher, the possession of which controls the subject-matter of the gift. Our law still, I think, makes the absolute vesting of title to the voucher or instrument as a chattel in the donee, so as to make the same irrevocable by the donor, indispensable to the effectuation of a gift *inter vivos.*

It seems very strange when we have in view the strict provisions and the well-recognized policy of our statute of wills, that a dying man, possessed of a fortune of $100,000 in money, jewels and negotiable securities, can make what is in fact a testamentary disposition of this entire fortune through the form of a gift *causa mortis* theoretically without any witness to the transaction except the donee himself. This extreme result, practically, if the test case were properly tried on behalf of de-

cedent's estate, might not be reached, but to sustain the gift a single witness who would be qualified subsequently to testify is all that our present law requires. Our law, I think, has not been adjusted to meet a case like this, because it is extremely improbable that such a case will arise.

If there is danger from the relaxation of the older law of gifts, and the maintenance of the law of gifts *causa mortis* in its present form, such danger pertains to the savings of millions of the inhabitants of the United States which are kept invested in savings banks. None of these small fortunes under our law of wills can be disposed of by a written testament in the usual way, without strict compliance with the law which requires the execution and publication of the testamentary instrument in the presence of two witnesses who sign as witnesses in the presence of the testator and each other. A dozen credible witnesses, standing by and witnessing the whole transaction, cannot prevent the will from being declared invalid, if, for instance, one of the attesting witnesses was brought into the transaction and signed his name a few minutes after the other part of the ceremony had been performed. And yet the little fortune invested in a savings bank account upon which this attempted testamentary disposition could not operate, can be obtained from the dying bed of the decedent, and with the aid of a single witness after the death of the decedent be established as a gift *inter vivos* or *causa mortis.*

In one or more of the states a statute has been passed providing that a gift *causa mortis* can only be established by two witnesses attempting plainly to assimilate the probate of the *donatio mortis causa* to the probate of a written will.

Entertaining the views which I do as to the danger of fraud through the easy establishment in the courts of gifts *causa mortis* and gifts *inter vivos,* which are not subjected to scrutiny until after the death of the alleged donor, I do not think that any one of these gifts should be upheld unless it is directly within what already has been declared and recognized as established law, and I am sustained in this attitude by the intimation of the policy of our law, which I think is most distinctly made by the court of errors and appeals in the *Keepers' Case.* If the

law of gifts of savings bank deposits attempted to be made by
dying persons is to be extended so as to validate a donation like
this, where the external form of the gift consists in the delivery
of a check for a part of the account with the temporary loan of
the pass book so as to enable the payee of the check to get it
cashed at the bank, in my judgment such extension should be
made by our court of last resort.