HUDSON TRUST COMPANY, a corporation of New Jersey, as executor of the last will and testament of Timothy D. Murphy, deceased, complainant,

*v.*

MARY J. MURPHY et al., defendants.

[Decided May 2d, 1935.]

*Messrs. Hopkins, Vorburger & Dickson,* for the complainant.

*Messrs. Lichtenstein, Schwartz & Friedenberg,* for the defendants.

EGAN, V. C.

Timothy D. Murphy departed this life on February 19th, 1934, at the age of eighty years. At the time of his death, he left surviving him his widow, Mary J. Murphy, and their two daughters, Irene C. Kennedy and Genevieve McDonald, and a daughter, Mary C. Kelly, by a previous marriage. He left a last will and testament, duly probated, in which he named the complainant his executor. The bill seeks to discover assets of the estate; it also questions the validity of alleged gifts of stocks and bank accounts. The stocks consist of twenty-three shares Standard Oil Company of California and thirteen shares Texas Corporation, which the defendant Genevieve McDonald claims to have received from

the decedent on February 16th, 1934, three days before his death; the savings accounts consist of one in the Trust Company of New Jersey amounting to $232.83, and another in the Hudson Trust Company amounting to $1,098.28, both of which on February 17th, 1934, were allegedly given to the defendant Irene C. Kennedy, in trust, to take care of her mother, the said Mary J. Murphy.

The decedent's marriage to Mary J. Murphy, the defendant herein, created friction between his daughter, the said Mary C. Kelly, and her step-mother. It resulted in Mary being sent to a boarding school; her board and tuition were paid from money which she inherited from her deceased mother. At the completion of her school days, Mary returned to her father's home. Due to the unpleasant relations which existed between her and her step-mother, Mary's stay there was of short duration. The decedent had her placed with other relatives. The step-mother's treatment of Mary was bitterly resented by the decedent. After her departure from his home, the decedent visited Mary at regular intervals; these visits continued until she married and made her home in Detroit, Michigan, after which the decedent wrote her frequently and visited her, at least, once annually.

The daughter, Irene C. Kennedy, received a college education, while the education of the other daughter, Genevieve McDonald, was limited to high school and a business course. The expense of their education, unlike Mary's, was provided by the decedent.

The evidence indicates that the apparent differences between his daughter Mary and his wife made the decedent's marital career a very unhappy one. There were many quarrels. The evidence of this is supplied, in part, by Genevieve McDonald, the decedent's daughter, who said: "They weren't very loving. They did scrap. My mother and father and Mrs. Kelly all had a lot of trouble years ago. I was eight years old when Mrs. Kelly left and my mother and father never got along very well. But the last few years they had been. Well, mother did everything for him when he was sick. They weren't really lovable, but they had a nice home down there and were comfortable, and my mother did what he wanted."

The decedent's widow admitted that she and her husband occupied separate rooms and did not cohabit for many years; he left her bed and slept alone in an attic room of their home; this room was without heat. Mrs. Murphy said that the decedent "selected the room himself. He would leave my bed and go up to the attic. I told him that if he did that again he would never cohabit with me in my room." "*Q.* You told him never to come back again? *A.* If he persisted the third time."

The lack of marital felicity between the decedent and his wife is traceable to the wife's attitude towards her stepdaughter Mary. It caused the decedent to leave his home and remain separated for several weeks from his wife. The house occupied by the decedent and his wife was owned by Mrs. Murphy, the defendant. Prior to his death, the decedent's children, Irene C. Kennedy and Genevieve McDonald, appeared to be comfortably situated. The decedent knew this. He indicated that his daughter, Mary C. Kelly, was not by him afforded the advantages which he had given his daughters, Irene and Genevieve. On several occasions he referred to the fact that Mary's education was paid for out of her own inheritance from her mother and without aid from him. He often said that she had been driven from his home because of the unpleasant relations that existed between her and her step-mother. He indicated that because of the slights which Mary received he was going to make amends to her, and that he would make provision for her. Pursuant to that expressed determination, he had several wills drawn in which he made her the chief beneficiary. Each time he executed a will, he mailed a copy of it to her accompanied by a letter, two of which are as follows:

*Exhibit C-7*

"36 Fulton Street,
Weehawken, N. J., 5/9/32.

My dearest Mamie:

I am enclosing a copy of a Will which was made out a few days since and which is now the valid one—so destroy the copy of the previous one in writing which I enclosed to you when the first one was made. You will observe that the name of Mr. Harrison W.

Delamater is on the most recent one in place of Mr. Clarence Mabie, but Mr. Christian P. Mabie signed the second Will also. Both these gentlemen are amongst my dearest friends and if and when necessary to consult them about the Will and disposition of its contents, will gladly give you any assistance in their power. This may be at any time, for I am about to go to St. Mary's Hospital at Hoboken, N. J., for an operation which will be very painful, but so far as I can judge not a dangerous one. I may be confined there a few weeks. Do not be alarmed about this. I will give your address to Genevieve who will keep you informed of my condition from time to time. All my plans for the summer are now changed. Among them the one I looked forward to with greatest pleasure was the time I expected to spend at your home. If you come here for Maria's graduation be sure to see me and write me on receipt of this to my present residence and Genevieve will bring it to me. I am also enclosing evidence of my ownership of Plot No. 23 or 24 in Mt. Olivet Cemetery, Elizabeth, N. J., also arrangement for its perpetual care. * * * Have not heard from the Hughes family for several weeks. Had intended to visit them Sunday last but due to illness could not do so, but assume they are all well including the baby. You should see them when you arrive here.

\*    \*    \*    \*    \*    \*    \*

May God bless you all and anticipate seeing me again amongst you in better health and happy to again see you, I remain,

Your devoted and loving father,

TIMOTHY D. MURPHY."

*Exhibit C-8*

"36 Fulton St., Weehawken, N. J.
Dec. 14th, 1932.

Dear daughter Mamie:

I have completed and deposited my last Will and Testament in my deposit of the Hudson Trust Co. Bank of Union City, N. J. I am enclosing a copy of same. It is not usual to place in the hands of anyone the copy of a Will, for many law suits have resulted by heirs and beneficiaries who placed a wrong interpretation on its contents and meaning. Destroy at once all Wills or parts thereof that may be in your possession and attach this letter to the copy I herewith enclose, which you should retain until the final settlement of the Estate as mentioned in the Will is made.

The charge for arranging and settling the bequests by my Executor will be determined by the Court and will be the same in amount as if an individual performed such duties. My Will together with securities is now in deposit box No. 1407, key to same No. 1741 in the Hudson Trust Co. Bank, 52nd St. and Hackensack Plank Road, Union City, N. J. Mr. Banta, Attorney at Law, drew up my Will. He was a former associate of Mr. Clarence Mabie, now deceased. Mr. Banta's office is on Main Street in a 14 story building on 7th floor, Hackensack, N. J.

The following names and addresses are those who signed my Will as witnesses.

Mr. Harrison W. Delamater
149 49th St., Union City, N. J.
Christian P. Mabie—Bergenfield, N. J.

Should you at any time desire any information of each or both of these witnesses they will gladly comply since they are both among my most devoted and reliable friends.

On my demise the Hudson Trust Co. will place my Will with the Surrogate's Office where it will remain six months to make note of any claim or claims on my estate made previous to my demise.

With much sorrow I have to advise you I can offer no remembrance this holiday season. Whatever available means one may have it might be judicious to keep in view of the uncertainty of the future. Since my earning power has ceased and expected doctor bills to meet soon, I will have to be very careful of the expenditures to follow.

With usual love to you all, I remain—devotedly yours,

TIMOTHY D. MURPHY [father.]"

The decedent's will (*Exhibit C-9*), in part, is as follows:

"2. I give and bequeath to my wife, Mary J. Murphy, the sum of One Hundred ($100) Dollars, together with the household goods contained in our residence.

3. I give and bequeath to my daughter, Genevieve McDonald, wife of Joseph N. McDonald, of Tenafly, New Jersey, the sum of Five Hundred ($500.00) Dollars.

If my said daughter, Genevieve McDonald, shall predecease me, then and in that case, I give and bequeath the said sum of Five Hundred ($500.00) Dollars, to my daughter, Mary Catherine Kelly, wife of James J. Kelly, of Detroit, Michigan.

4. I give and bequeath to my daughter, Irene C. Kennedy, of Scarsdale, New York, the sum of One Hundred ($100.00) Dollars.

6. All the rest, residue and remainder of my estate, I give and bequeath to my daughter, Mary Catherine Kelly, wife of James J. Kelly, to her, her heirs and assigns, forever.

*This bequest shall include all stocks and bonds, all securities, cash, jewelry and all other personal effects.*

7. It is my desire that my body be interred beside that of my former wife nee Catherine E. Hughes, in Mount Olive Cemetery, Elizabeth, New Jersey, and that the necessary funeral arrangements be made and my burial conducted in accordance with the wishes of my daughter, Mary Catherine Kelly."

It will be observed that the sixth paragraph of the will contains the following:

"This bequest shall include all stocks and bonds, all securities, cash, jewelry and all other personal effects."

The above bequests are quite significant of the decedent's state of mind, and, to some extent, is an evidence of his sense

of justice. In addition, a letter to his nephew, Peter L. Hughes, Jr., dated December 18th, 1933, *Exhibit C-6,* indicates to some extent the attitude of the decedent towards his widow. It is as follows:

"My dear Peter:

I had hoped to be able to call to see you 'ere this, but put it off until the near approach of the Holiday season. Unexpected conditions developed that will make it impossible to make the expected visit and I fear I cannot get to your place for some time to come. * * * I suffered a severe heart attack resulting in such shortness of breath that the Dr. cautioned me to remain in doors and rest for the present. In addition to this I am suffering from acute stomach trouble which seems to become more aggravated instead of responding to his medicine. * * * My thoughts now are centered on the disposition of my body. Should I pass away while so seriously afflicted, as you are aware, I wish my remains to be interred in my plot in Mt. Olivet Cemetery in Elizabeth at any and all costs. My present wife has been offered the privilege of occupying a grave in the plot, but declined in a very emphatic manner. Her former home is at Frankfort, N. York in the Mohawk Valley 17 miles this side of Utica, N. Y. or 215 miles from N. Y. City. I am quite sure if opportunity offers she will have my body taken there to be interred among her deceased relatives. This cemetery is in an almost inaccessible place where my grave would not be visited by relatives or friends. This however is no reflection on my wife's relatives or her friends. Our two daughters would support *their mother to have her wishes carried out if possible,* but I do not wish to be taken there. In my Will it is specified that my daughter Mamie will supervise and make arrangements for my burial and holds a copy of the Will. My Executor of the Will is Hudson Trust Co., 32d St. and Hackensack Plank Road, Union City, N. J. A receipt for the Will is in my deposit box in that institution. My daughter, Mamie's address is 1553 Hurlbut Ave., Detroit, Mich. Should I be confined in a hospital, will request that Undertaker Higgins of Elizabeth be sent for at or before my demise to take and prepare my body for burial. I will endeavor to inform you if taken from my present home for treatment. * * * When able will call to see you all, *for I am very desirous to make further remarks that will be more explanatory and must see your little darlings at the earliest opportunity.*

Yours in unlimited affection, together with the compliments of the season,

UNCLE TIMOTHY."

After writing this letter to Peter, the decedent, on January 21st, 1934, visited him and his sister, Eleanor Hughes. Eleanor testifying about the visit said: "One thing he particularly asked was if I knew of any institution where he

might go to spend his remaining days. I suggested the Alexian Brothers Hospital in Elizabeth, and also I had heard of a home in Denville, New Jersey. He said the conditions in his home were so unbearable that he didn't care to spend his last days there or die under its roof. He also spoke of the fact that he had made a will and in the will he asked that he be buried in Elizabeth, New Jersey, in Mt. Olivet Cemetery beside his first wife. He said that he wanted to go there. Q. Did he say anything else with respect to the provisions of the will? A. Yes, he said that he wanted us to bear witness to the fact he had made Mrs. Kelly his chief beneficiary, and he wanted us to know it because he knew that after he had gone Mrs. Murphy and her daughters would do everything in their power to keep everything from Mrs. Kelly."

Peter L. Hughes testifying (pages 110 and 111 of testimony) said: "Well, he came to my home with my sister who preceded me on the stand, and Mrs. Kelly and my wife were present, and we talked, and he did mention about his remains being buried in Elizabeth in Mt. Olivet Cemetery. In fact he mentioned that very many many times before to me. I procured the plot. At least I as executor of my father conveyed the plot to him about two years ago, so I knew of his intentions at that time. During the conversation in my home Mr. Murphy mentioned again about the will in the presence of all whom I have mentioned, and I am very sorry to say he made this expression. He said, referring to his wife, 'I have lived with her above ground for forty years and I don't want to be buried underground with her.' That was after he told me he had offered the plot with him, which she had refused."

On January 24th, 1934, the decedent visited his niece, Elizabeth D. Uhl. She testified they had a conversation; her testimony in part, is as follows: " 'I want you all to know I want to be buried right alongside of my first wife in Mt. Olivet Cemetery in Elizabeth,' and he talked at some length about his first wife, and he broke down and cried. That was the first time I ever saw him cry. He spoke of how unhappy he had been at home with his second wife, and he

said he wanted Mamie to be the chief beneficiary of his will, and spoke about him not being able to give her a home when she was young and wanted to make up for her."

On January 11th, 1934, he wrote two letters, one to Leigh Fritts, a friend of thirty years standing, and another to Harrison W. Delamater. In these letters he indicated that he desired to have his remains interred beside those of his wife and child in Mt. Olivet Cemetery. It was testified to by Fritts that he had had a conversation with the decedent in the course of which the decedent said, "he had left * * * Irene one hundred dollars, Genevieve five hundred dollars, Mrs. Murphy one hundred dollars, *and the balance of stocks and bonds and what he had in the bank would go to Mrs. Kelly."* The witness further said that "he told me that Mrs. Kelly had never had a chance and that the two girls had, and while he wasn't in a position at the time she was a child to do for her what he wanted to do for the others, that he felt he ought to make what amends he could now." Further testifying, the witnes said: "The morning of the 12th I was on my way to Mr. Sheldon, who is the secretary of the railway conductors, and I met Mr. Murphy on Louisa Place. He told me he was just on his way around to see me. We stood there and talked for a while, and he spoke about the certificates that he had, and he told me who he intended leaving them to, which was Mrs. Kelly. *Q.* What day was that? *A.* February 12th. And I asked him if he had the stock transferred to whoever he intended to leave them to. He said he had not, he didn't think about it. I said, 'to whoever you intend to give them have them transferred to them because it will save a lot of expense to you.' *Q.* What stocks did he refer to at that time? *A.* I knew he had Standard Oil of California and Standard Oil of New Jersey, Public Service and Teck Hughes, because he and I bought Teck Hughes at the same time. *Q.* And did he tell you to whom he intended to give those shares to? *A.* He told me in all his conversations it was his will they were to go to Mrs. Kelly."

The conversation with Fritts took place approximately one week before the decedent's death.

On February 14th, 1934, the decedent accompanied Mrs.

McDonald to her home where he died three days later. Mrs. McDonald testifying about the alleged gift of the stock from her father to herself, a day or two before decedent's death, said: "When I went upstairs he was sitting on the bed, and he called me over to him and he showed me a dark red folder. He put it in my hand and said, 'Genevieve, this is going to get me—I am through now—this is the end, and I want you to take these stocks because I am not going to get better and I want you to have them.' " This incident is alleged to have taken place a day or two before decedent's death.

In reply to a question by the court, Mrs. McDonald said: "He called me over to the bed. He was in his bedclothes, and he said, 'Genevieve, I want you to listen to me. I want you to take these stocks and keep them and take care of them because I am not going to get over this cold,' and I said, 'oh, dad, don't be silly. You have had worse colds than this. You just get into bed and take care of it.' "

The following day, February 17th, 1934, which is the day following the decedent's arrival at the home of his daughter, Genevieve McDonald, at approximately six o'clock in the morning of that day, Genevieve discovered the decedent in the bathroom dressed, with his clothes packed, and ready to leave her home and to go to a hospital. She said that she then called her mother and, between them, they dissuaded the decedent from leaving the McDonald home. In the talk that ensued between the decedent and Genevieve, she said her father then stated, "I am going to die and I am going to a hospital. You have had enough trouble. I am not going to die here."

The related circumstances surrounding the alleged gift of stock, which had an approximate value of $1,312.48, in my opinion are earmarked with doubt and suspicion, and lacks certainty. Considering the source of the testimony as to the gift, the interest of the parties in the outcome of this suit, the feeling of antagonism between the decedent and the widow; the affection he had for his daughter Mary; the decedent's declared intention to bequeath the stock to his daughter Mary, and the bequest in the will itself of the stock to Mary, all negative the assertions of the defendants on the *bona fides* of the gift.

It is to be recalled that the decedent arrived at the home of his daughter, Genevieve, on February 16th, 1934; on the same day, or night, she said the decedent gave her the stock. It must be borne in mind that Mrs. McDonald endeavors to hold the stock; she claims to be the donee and is very much interested in the outcome of this litigation, as are also the other two defendants. The alleged gift of the stock is supported by no testimony excepting that of the donee, Mrs. McDonald, and her mother, Mrs. Murphy. These two defendants, in testifying on other phases of this suit, materially contradicted each other; that, to some extent, casts suspicion upon their credibility.

Mrs. McDonald, on learning the contents of her father's will, consulted an attorney about filing a caveat against the probate of the will. She declared she visited the attorney's office with her mother. The mother flatly contradicted the daughter and said she did not accompany the daughter to the attorney's office. While a caveat was filed, the probate of the will was not contested and letters testamentary were accordingly issued to the complainant.

The principles mentioned in the case of *Matthews* v. *Hoagland, 48 N. J. Eq. 455; 21 Atl. Rep. 1054,* have a bearing on the situation which appears to exist in the instant case; the court there said: "If the decisions in this state did not seem to require an assignment in writing, I would be satisfied that the failure of Henry Matthews to execute the transfer and power of attorney on the back of the certificate was conclusive evidence that he did not intend to make a present gift of the stock, and to divest himself of all control and dominion over it or its proceeds."

The decedent, a man of unusually keen intellect, was informed by Fritts, approximately one week before his death, that the stock could be transferred only when endorsed. He had fixed and decided notions of what should be done with his estate after his death. He was a man of detail and precision. His failure to legally assign the stock, I feel, can be attributed to the fact that he did not transfer, nor intend to pass title to the stock.

The decedent's daughter, Irene C. Kennedy, stated that

her father made a gift of his bank accounts to her, and that he said: "'Irene, get those bank books out of my coat pocket.' His coat was hanging in the closet in the same room. I went and got the two bank books and handed them to him. He took my hand and he said, 'now, Irene, I am going to die.' He said, 'I know this is my end.' He said, '*I want you to take that money and take care of your mother.*' I said, 'oh, papa, don't talk such nonsense. In a week or so you will be up around again.' He knew he was sick, but I said, 'you will be all right,' and I took the books and I put them in my purse and spent the rest of the day in and out of the room."

This alleged gift was made at the time the decedent was evidently ill, in the McDonald home, about February 16th, 1934. If the facts are as stated, then the gift would be one in trust for the benefit of the mother of Mrs. Kennedy. It was made "to take care of her mother." Both Mrs. Kennedy and her mother testified about this gift; they are parties interested in the outcome of this suit.

"The naked and absolutely uncorroborated testimony of a donee will not be accepted as sufficient to sustain a gift as against the estate of a deceased donor." *Heyer* v. *Sullivan, 88 N. J. Eq. 165; affirmed, Ibid. 595.*

In the face of the evidence in this case, does it seem reasonable and probable that the decedent did as alleged? I cannot so conclude.

In *Berg* v. *Baldwin, 84 N. J. Eq. 90; 92 Atl. Rep. 90,* Vice-Chancellor Backes there said:

"To all intents and purposes he was the complaining party and deeply interested in the outcome of the suit. He was striving for a stake, for which he had no living opponent. He feared no contradiction, because the tongue of his real adversary was silenced by death. While his testimony was legally competent, I did not feel, under the circumstances, that I should accept it as true. It was absolutely devoid of corroboration by person or in circumstance, and I regarded myself as not justified in advising a decree depriving a decedent's estate of its property upon the naked and meagre words of this very much interested person. I have since examined the books and find this view is supported by authority. Taylor, in his work on Evidence, section 965, says:

" 'It has sometimes been supposed that it is an absolute rule of law that a court cannot act on the unsupported testimony of any person in his own favour. But there is no actual rule of law to the effect suggested; though a court ought to regard a claim against a dead man's estate which is only supported by the evidence of the claimant with jealous suspicion, and neither itself act upon it nor allow a jury to do so without corroboration, and this irrespective of persons.'

"The doctrine is applicable, regarding, as I do, the witness as the substantially interested party in the cause."

This case was affirmed by the court of errors and appeals (*84 N. J. Eq. 193; 93 Atl. Rep. 1084*), adopting the opinion of Vice-Chancellor Backes.

· "In a case where the only witness to the alleged gift is the wife of the donee, it is proper for the court to consider surrounding circumstances, personal interest and the actions of the claimant at or immediately subsequent to the alleged gift." *Madison Trust Co.* v. *Allen, 105 N. J. Eq. 230; 147 Atl. Rep. 546.*

"Gifts *causa mortis* are not favored in the law, and cannot be proven by violent inference from disputed testimony. Cannot be proven by mere hearsay declarations of the alleged ·donee." *Buecker* v. *Carr, 60 N. J. Eq. 300; 47 Atl. Rep. 34.*

In the case of *Provident Institution for Savings* v. *Mead, 87 N. J. Eq. 424; 100 Atl. Rep. 894; affirmed, 88 N. J. Eq. 349; 100 Atl. Rep. 894,* the court there held:

"Mrs. Bowdoin also was in the custody and under the control of the active agents of the alleged donee and her memory had greatly failed. The circumstances under which this gift was made, made it the duty of the claimant, the donee, to produce all the testimony obtainable to show that Mrs. Bowdoin was competent to make the gift, and in fact knew what she was doing and acted without undue influence from the agents of the donee. * * *

"I understand that counsel agree that if this gift was made it was a gift *inter vivos* and not a gift *causa mortis,* notwithstanding the fact that the alleged donor was on her dying bed, and if she understood her condition must have known that she had not long to live. Alleged gifts made by

old and feeble persons and persons stricken with fatal illness, if valid, often must be classified as gifts *inter vivos,* nevertheless, being asserted after the death of the alleged donor, they seem to be in many respects in the category with gifts *causa mortis* in respect of the safeguards and protective conditions which the law should throw around the transaction. There seems to be as much danger in permitting a person to establish a gift *inter vivos* to himself by producing a key or a savings bank book obtained from the deathbed of an alleged donor, as there is in permitting a person under such circumstances to establish a gift *causa mortis."*

I cannot reach the conclusion from the testimony that has been offered in this case that the decedent made the gifts as indicated by the defendants. I am convinced that he did not. The decedent had conversed, had written letters, showing his state of mind and his feeling, all of which were entirely at variance with his attitude as it was declared to have been by the defendants herein. I cannot reconcile the decedent's last alleged gifts to Mrs. McDonald and Mrs. Kennedy, with his numerous attestations of affection for his daughter, Mrs. Kelly, and his declared desires to make amends to her." They do not seem just orderly.

In the case of *Whitney* v. *Wheeler, 116 Mass. 492,* it was held:

"When there is any ground for doubt as to the intent with which a delivery of property was made, or whether in fact its possession was obtained by delivery as a voluntary gift or in some other mode, evidence tending to show a continuous and apparent fixed state of mind and purpose, inconsistent with such alleged gift, existing previously thereto, may have a legitimate bearing upon the case to affect the inferences to be drawn from the facts and circumstances attending the transaction."

A gift of stock without endorsement carries no title. In *Heyer* v. *Sullivan, supra,* the court said:

"Delivery of a certificate of stock without actual transfer or a written assignment or power to transfer, although accompanied with words of gift, does not constitute a valid gift *inter vivos."*

"In cases of gifts *inter vivos* or *causa mortis,* both delivery and donative intent must clearly appear." *Madison Trust Co.* v. *Allen, 105 N. J. Eq. 230; 147 Atl. Rep. 546.*

In the case of *Besson* v. *Stevens, 94 N. J. Eq. 549* (at *p. 563*) ; *120 Atl. Rep. 640,* the court of errors and appeals held :

"In addition to the lack of donative intent, I am satisfied, too, that there was no valid delivery. * * * The transactions took place subsequent to the Uniform Stock Transfer act (*P. L. 1916 p. 398*), and are therefore subject to its provisions. Section 1 of that act provides that title to a stock certificate, 'and to the shares represented thereby,' can only be transferred by delivery of the certificate endorsed or accompanied by a written assignment or power to assign, &c.''

Vice-Chancellor Fallon in the case of *Pattberg* v. *Gott, 102 N. J. Eq. 371; 140 Atl. Rep. 796,* held :

"Although certificates of stock may be subject to gift, to effect gifts thereof there must be delivery and intent to make gift, together with delivery of certificate endorsed or accompanied by written assignment or power to assign, under Uniform Stock Transfer act. *P. L. 1916 p. 398 § 1.*"

"In my judgment the character of the property in shares of a corporation, as well as the distinctive qualities of a gift *inter vivos,* forbid a departure from the rule, that a valid gift of such property cannot be made by the delivery of the certificate of stock, without formal transfer, or an assignment and power in writing to transfer the shares." *Matthews* v. *Hoagland, supra.*

"The gift is typically 'causa mortis.' The legal requirements of this form of gift are the same as a gift 'inter vivos.' The two are alike in composition and legal effect differing only in their consummation. Both are between living persons; the former is made under apprehension of death, the latter is not, and while both gifts must be presently operative, *causa mortis* is conditional, *inter vivos* is absolute." *Meyers* v. *Meyers, 99 N. J. Eq. 560; 134 Atl. Rep. 95.*

Considering the advanced age of the decedent; the fact that he had little means; and that he and his wife were dependent upon what appeared to have been his modest accumulation, the gifts, or the distribution of his cash, might

properly be termed improvident. *Pearce* v. *Stines, 79 N. J. Eq. 51; 80 Atl. Rep. 941.*

Under all the circumstances, I feel that the gifts should be declared void—the gift of the stock and the bank accounts are void. I shall advise a decree to this effect.