ELWOOD PEARCE

*v.*

LODEMIA STINES et al.

[Decided July 19th, 1911.]

1. Where deceased executed deeds of gift to each of his children, deposited them with his agent, to be delivered only after his death, because he might need some of the property for his own use, and thereafter directed one of them to be delivered immediately, it cannot be avoided on the ground of mistake, though the undelivered deeds were invalid because of their testamentary character; it being impossible to say that it was his intention, persisted in till the end, that no part of his original scheme should be carried out, unless it was all carried out.

2. A gift of his homestead by one enfeebled by age and disease, without competent and independent advice, the deed therefor containing no power of revocation, and no provision for support, to a daughter in a position to exercise a dominating authority, is of practically all his property, and so invalid; what remained being unimproved and at most barely enough to repay his son, who had made and was making advances for his support.

On bill, &c.

*Mr. Charles E. Cook,* for the complainant.

*Mr. Charles H. Ivins,* for the defendants.

STEVENS, V. C.

William B. Pearce, a boat builder, residing at Point Pleasant, died intestate on November 28th, 1909, at the advanced age of eighty-three. Prior to his death he had executed deeds for all his real estate (his personalty being of little value) to his five children. These deeds were acknowledged and placed in the hands of his agent, Allen, to be delivered after his death. The disposition was so plainly testamentary that it was conceded by counsel that it failed under the rule of *Schlicher* v. *Keeler, 67 N. J. Eq. (1 Robb.) 635.* One of the deeds prepared in January, 1909, was, however, through a change in the donor's intention actually delivered to his daughter, Lodemia, on October 11th, 1909, or about seven weeks before his death. The debatable question is whether this conveyance is good. It is admitted to have been made without consideration, and to have been intended as a gift or advancement. The bill charges, that it, with the others, was the product of undue influence, and was obtained at a time, when by reason of his mental and physical infirmities, the donor did not possess sufficient mind to understand in a reasonable manner the nature and effect of his act.

Although the evidence is conflicting, it seems probable that at the time this deed was executed and acknowledged in January, 1909, and at the time the donor directed its delivery, he thoroughly understood what he was doing. He was suffering from Bright's disease, and from hardening of the arteries, and in October, 1909, he was, physically, very weak. No doubt his vigorous mind had then become somewhat impaired, but there is no evidence that at the time he wrote the note to Allen directing him to give Lodemia's deed to his son Robert, he did not, in a reasonable manner, comprehend the nature and effect of the act he was doing. There is no proof that either at the time he executed it in January, or at the time it was delivered in the following October, any undue influence was in fact exerted. So far as the *delivery* of the deeds was concerned; he had in January, 1909, intended to treat all his children alike. But his daughter, Lodemia, had late in the summer of that year been obliged to undergo an operation in the hospital. It left her very weak, and the donor appears to have been apprehensive that if she died from its effects,

her children might not get that which he had intended that she, the favorite daughter, should have.

In this state of facts, complainant's counsel argues—first, that the delivery of the deed was tainted with the mistake the donor was under that all the deeds would take effect, and that, in the case of Lodemia, he was simply anticipating; that as they did not take effect, the scheme, as a whole, failed, and that in equity, the conveyance to Lodemia should fall with it. Second, that inasmuch as he gave Lodemia the most valuable part of the property—that on which he depended for shelter and support—the case comes within the rule of *Slack* v. *Rees, 66 N. J. Eq. (21 Dick.) 447.*

It appears to me that the first insistment is untenable. As to Lodemia, there was no mistake; she got just what her father intended her to have. There is no evidence going to show that he made the delivery upon condition that the subsequent delivery to the others would be effectual, though no doubt he then thought it would be. Suppose that at the time he had given the deed to Lodemia he had executed a will disposing of his other property to his other children. If this will had failed through lack of proper execution, would the deed have also failed? And yet the testator would then have supposed, as in the case in hand, that his disposition of his property was complete. Indeed, the evidence is, that the donor directed Allen to hold the deeds, undelivered, for the very reason that he might subsequently require more or less of the property, or its proceeds, for his own use. It seems, therefore, impossible to say on the evidence that it was his intention, persevered in until the end, that no part of his original scheme should be carried out, unless it was all carried out.

The second insistment presents more difficulty. If the donor had conveyed *all* his property to his favorite daughter under the same circumstances that he conveyed a part, the case would have plainly fallen within the rule of *Slack* v. *Rees.* We would have had the case of a donor enfeebled by age and disease, and without competent advice; of a daughter in a position to exercise a dominating authority; of a deed containing no power of revocation, and no provision for support, and of an utterly improvident

act. But the donor only gave a part, and the question is whether he gave enough to bring the case within the rule mentioned.

In *Post* v. *Hagan, 71 N, J. Eq. (1 Buch.) 242*, Mr. Justice Garrison said that the essential difference between *Haydock* v. *Haydock's Executors, 34 N. J. Eq. (7 Stew.) 570*, and *Slack* v. *Rees*, consisted in this: That *Slack* v. *Rees* had specific application to cases in which the gift, if valid, had the effect of stripping the donor of all, or practically all, of his property; whereas *Haydock* v. *Haydock* applied to gifts that bore no such relation to the donor's entire estate. The cases of gifts, whose validity has been passed upon by our court of errors and appeals, may, perhaps, be thus classified:

*First.* Gifts made by a man who, in the full possession of his powers, still occupied the dominant position, and was besides in a position to support himself by his own exertions. Such a man might give his children all his property, whether his act were provident or improvident. *James* v. *Aller, 68 N. J. Eq. (2 Robb.) 666.*

*Second.* Gifts, reasonable in amount, of part of her property made by an aged parent to a child, who was in a position to exercise a dominating influence, but who, as the evidence showed, did not, in fact, exercise it. Such a gift is valid. *LeGendre* v. *Goodridge, 46 N. J. Eq. (1 Dick.) 419; 48 N. J. Eq. (3 Dick.) 308.*

*Third.* Gifts of a part of his property, made by a donor, enfeebled by age and disease, to one in a position to exercise a dominating influence, who has not been able to satisfy the court "that the donor understood the nature of the act, and that it was not done through the influence of the donee." *Haydock* v. *Haydock, 34 N. J. Eq. (7 Stew.) 570, 574.*

*Fourth.* Gifts of all, or, as it is phrased in *Post* v. *Hagan*, "practically all," of the donor's property, made to a child, at a time when, by reason of the donor's physical condition and his dependence on the donee for care and service, the relation ordinarily existing between them, had been reversed, and the child had come to occupy the dominant position. In this case, proof that no influence was in point of fact exercised will not suffice. There must be proof, in addition, that the donor had competent

and independent advice as to the effect of his act. *Coffee* v. *Sullivan, 63 N. J. Eq. (18 Dick.) 302; Slack* v. *Rees, supra; Post* v. *Hagan, supra; Albert* v. *Haeberly, 68 N. J. Eq. (2 Robb.) 664.* Advice, as was said in this court, in *Motz* v. *Motz* (*affirmed, 76 N. J. Eq. (6 Buch.) 609*), actually given—not such as the legal adviser could or might have given, but did not give.

In none of the cases has it been necessary to pass upon the question of exactly how much a donor might give without bringing himself within the rule of *Slack* v. *Rees.* That the rule may apply, must he give at least nine-tenths or some other definite fractional part of his whole estate? Or are we to look at the effect of the gift upon himself? The question seems to me to be not so much one of definite fractions, as of practical results. The principle of decision, as pointed out by Judge Vredenburgh in *Coffee* v. *Sullivan, supra,* is that a man enfeebled by age and disease may not unadvisedly divest himself of his property, at a time when he can no longer work, and when by so doing, he becomes dependent upon the charity of others or of the public. I think the practical rule to be deduced from the cases is that a donor, having barely sufficient property to sustain himself for the rest of his life, shall not irrevocably, and without advice, give away so much of it as to leave himself an object of charity.

The law does not go to the length of saying that a donor, incapacitated by age or disease from earning his own living, may not, even improvidently, strip himself of all his property beyond recall, although there are cases which seem almost to go to that extent (*Powell* v. *Powell (1900), 1 Ch. Div. 246*); but it does say that his gift shall not stand, unless he have competent, independent advice, and refuse to act in accordance with it.

Tested by this rule, the gift in question must fail. The donor did not have competent, or any advice, when he decided to deliver the deed to Lodemia in his lifetime. The deed conveyed the homestead property—the house in which he had lived for many years and in which he expected to die. He had no other. A competent adviser would have told him that the very reason which prompted him to accelerate the delivery, viz., fear that Lodemia might succumb to an operation, and that her infant

children would not then take under the deed, was a reason for not making the gift in that way; for these children, becoming the owners on Lodemia's death, their guardian might consider it his duty either to dispossess him or to compel him to pay rent.

The property of the donor consisted exclusively of real estate. The house and lot given to Lodemia is valued at $3,020; and his other land, all of which is unimproved, at $3,759. To this may be added the value of the household furniture—in the answer averred to be worth $300.

When the donor gave away his homestead, he had nothing of his own that he could sell but the vacant land. How salable this was does not appear. It is not likely that a purchaser could, at short notice, have been found, ready to pay its full value. It appears from the evidence that the donor was indebted to his son Elwood, the complainant, who was contributing a monthly sum to his support and who was relying upon his real estate as security for its repayment after his death. In his bill, Elwood charges that the indebtedness was upwards of three thousand dollars. It was probably, considerable, if less than the amount charged.

It seems to me that in this position of affairs the case is fairly brought within the principle of *Slack* v. *Rees*. The donor, by making an unconditional gift of his home, became largely, if not wholly, dependent upon the charity of others for his future support. His act was calculated to alienate the person apparently best able, pecuniarily, to assist him. Elwood was in a position to have subjected the unimproved real estate to the payment of what was due. Under these circumstances, the donor can hardly be said to have reserved for himself anything that was of much value. What he retained, he would hold by the sufferance of an offended son.