WILLIAM G. KELSO, complainant below, appellant,

*v.*

ANNA L. KELSO, defendant below, respondent.

[Decided May 19th, 1924.]

In the normal relation of the contracting parties to a future mar-
riage, the man occupies the dominant position, and, in the absence of
evidence that this relation has been reversed, a completed gift made
by him to his fiancée cannot be revoked at his option, even though it
plainly appears to have been improvidently made, and without the
benefit of competent, independent advice.

On bill, &c. On appeal from the court of chancery, advised
by Vice-Chancellor Bentley, whose opinion is reported in *95
N. J. Eq. 544.*

*Messrs. Ziegener & Lane (Mr. Harry Lane,* of counsel),
for the appellant.

*Messrs. Seufert & Elmore (Mr. William M. Seufert,* of
counsel), for the respondent.

The opinion of the court was delivered by

CLARK, J.

The facts presented by this appeal from the court of chan-
cery are simple, and perhaps not unusual. Complainant is
a widower, sixty-seven years of age, and the father of five
grown children, with the youngest of whom, an unmarried
daughter, he made his home after his first wife's death in
1921. For the greater part of his life he has been a shoe
salesman, and at the time of this suit and for several years
prior thereto he has sold shoes in Jersey City and Newark
for a New York firm. His earnings in his business have

netted him as much as $150 in a day, and even at the present time he averages $25 a week. Kelso confesses to excellent bodily health, and we find no suggestion in the record that his mental powers are not on a par with his physical. In fact, an even cursory reading of his own testimony would negative such an inference were it seriously put forward.

In these circumstances, complainant meets in the social activities of his lodge and of his church, a middle-aged lady, Mrs. Anna Toone, to whom he is greatly attracted. She is ostensibly a widow, and has three young children. He pays court to her and his affections, he believes, are reciprocated. After she has accepted him, she confesses that an impediment to their marriage exists in the person of a living husband, from whom she is separated, but not divorced. Complainant offers to pay the expenses of removing this obstacle and restoring his fiancée to the unmarried state. His offer is accepted and they, together with the children of Mrs. Toone, adjourn to Reno, Nevada, for this purpose.

In the meantime, complainant's children seem to have become aware of the proceedings of their parent, and decide to take a hand in them. Accordingly, they send to Mrs. Toone, at Reno, a telegram, which rather more than strongly suggests that their father is under some moral obligation to them. This communication, as might have been anticipated, has just the opposite of the desired effect on Kelso. In order to rehabilitate himself in the estimation of his bride-to-be and possibly also as a challenge to the binding force of the mysterious moral obligation, he promptly returns east and transfers to Mrs. Toone all of his property, only excepting therefrom, in his own phraseology, "his shirt."

There is some perhaps not unnatural conflict in the accounts of the interviews preceding this transaction. The lady claims that it was done without her knowledge. The gentleman, on the other hand, implies, if he does not expressly say, that in no other way could he both soothe her feelings, which have been rudely outraged by the conduct of his family and, more important still, obtain her consent to go on with the marriage.

After the divorce is procured, the present complainant and defendant are married, and set up housekeeping. Follows, and very soon, disillusionment and, subsequently, litigation. Kelso is now asking the court of chancery to assist him in recovering from his wife all of the real estate he conveyed to her, as he claims, only because of the undue influence which she exercised upon him. We consider the law applicable to such a situation clear, and to have been correctly stated by the learned vice-chancellor below.

We shall deal at some length with the presumptions, if any, arising out of the confidential relationship which exists between two persons who are engaged to be married. Apart from this, the only influence to which complainant was subjected arises from the implication in his account of his conversations with Mrs. Toone, following the threatening telegram she received from the Kelso family. If he is to be believed, she threatened to withhold from him her hand and person, which he admittedly greatly desired, unless she received all, or substantially all, of his worldly possessions. As to this, it is sufficient to say that complainant can hardly expect a court of chancery to assist him in withdrawing from such a bargain because of an alleged failure of consideration, due to the unhappiness of the ensuing marriage. Not, at any rate, in a day and civilization when the purchase of wives is no longer looked upon with favor.

It was very strongly pressed upon the court below, and is now earnestly argued in this court, that the complainant was not, before stripping himself of his property, in receipt of proper and competent, independent advice. For that reason, it is said, his gift can now be revoked. Slack v. Rees, 66 N. J. Eq. 447. We shall assume, as did the vice-chancellor, that Kelso's conferences with his lawyer did not include the giving and receiving of such advice. We shall further assume that complainant's present earning capacity does not lift him out of the condition of improvidence required by the cases before the gift can be attacked for lack of such advice. Siebold v. Zieboldt, 93 N. J. Eq. 327.

The courts of this state have followed the English authorities and consequently have gone to greater length in setting aside gifts *inter vivos* for lack of independent advice than has been the prevailing rule in this country. *14 Am. & Eng. Encycl. L. 1013.* Where certain confidential relationships between individuals exist, undue influence is presumed in cases where one of them, by reason of a gift of property to the other, faces the choice of becoming a charge, either upon the public or upon the gratitude of the donee. This presumption can be rebutted only by a showing that the donor was the recipient of competent, independent advice, both as to the legal effect and the worldly consequences of his act. *Post* v. *Hagen, 71 N. J. Eq. 234.*

Because of our presumed knowledge of the law, the courts of equity have not seen fit to extend their relief to mistakes of law, as well as to mistakes of fact. *Pom. Eq. Jur. 852, 842.* As an exception to this somewhat harsh rule, they do, however, set aside a transaction· if the mistake of law be made by a person whose relation to the person benefiting thereby is a confidential one. *Pom. Eq. Jur. 848.* In cases of a party's misunderstanding of the legal effect of his voluntary transfer, independent advice is of probative value on the question of whether any mistake of law was made rather than as evidence to rebut any presumption of undue influence.

In the class of cases, of which the one at bar is typical, the donor is misled by no misunderstanding of the law or of facts which formed the basis for his action, but because of a mistake in economic judgment, plus misplaced confidence in human nature, or, more particularly, in the nature of a particular human. The unwisdom of placing one's entire economic future in the hands of another person, at any rate until we achieve perfection, is obvious. Because of this, the courts have found that the will of a person taking such action must have been overpowered in cases where he is within the range of an influence which might have so affected him, and unless he has had the benefit of the judgment of a disinterested third party, to counteract such influence.

It is clear, however, that the influence of one person over another is found only in certain positive acts or in certain types of confidential relationships between them. Lord Justice Fletcher-Moulton, in *Coomber* v. *Coomber* (*1911*), *1 Ch. 723*, observed that although the relationship between himself and his errand boy was a confidential one, it did not follow that the latter had any influence over him. As influence, in term, implies that dominance has been achieved, it can only be presumed in relationships where one party occupies a dominant position towards the other.

Such dominance may arise from the facts of age, sex, the condition of mind or of body, or even of pocketbook of either of the parties, or from the customs of the particular civilization in which they live. A combination of certain of these factors without more, indicates a relation in which normally one of the parties occupies a dominant position. So it is in the relaton of parent and child. *James* v. *Aller, 68 N. J. Eq. 666.* On the other hand, either the bodily or mental condition of a father may reverse the original relation and make his child the dominant one of the two. *Coffey* v. *Sullivan, 63 N. J. Eq. 296.*

In the case of *Fretz* v. *Roth, 70 N. J. Eq. 764,* this court refused to set aside a gift by a husband to a wife, in the absence of proof that the normal relation, in which the husband occupies the dominant position, had been reversed. It may be that as social conditions continue to change, an analysis of the normal relation between husband and wife will lead us to hold that neither one of the two occupies a dominant position. Even a holding that they are on a parity would not, of course, lead to a different result in so far as the doctrine we are now considering is concerned. To decide differently in the case of parties who are under contract of marriage would be, it seems to us, to find the reason for our former decision in the ancient theory that a woman becomes the chattel of her husband. We prefer to hold that the husband's position in the family is based rather upon the characteristics of his sex and the customs of our civilization than upon his legal rights as a husband. These conditions arise

immediately upon the agreement of a man and woman to enter the state of matrimony.

This being so, it only remains to consider whether there has been proof that the original relation has been reversed because of other factors in, for instance, the bodily or mental condition of complainant or defendant. As we have said, no facts have been brought to our attention which reflect in any way upon Kelso's mental or bodily vigor. The evidence, in fact, is to the contrary. In that posture of the case the complainant has failed to establish that the conveyance of his real estate and mortgages was a result of the undue influence of the lady to whom he was engaged at the time when that took place.

The decree will be affirmed.

*For affirmance* — The Chief - Justice, Trenchard, Parker, Minturn, Kalisch, Black, Katzenbach, Campbell, Lloyd, White, Gardner, Van Buskirk, Clark, McGlennon—14.

*For reversal*—None.