The bill alleges that Mary Jane Murphy, a widow of the age of seventy-four years, residing with her son, Frank Sherry, and his wife, in the city of Long Branch, New Jersey, was on or about November 12th, 1935, persuaded by the defendant to leave her son's home and to reside with him in his home in the city of Jersey City. The defendant, at that time, was, and still is, a widower. His home was managed by a housekeeper, Edith Haight, formerly Edith McBride. She received from the defendant, as wages, the sum of $10 weekly.
Mrs. Murphy, by a former marriage, had two sons, a daughter, the complainant, and grandchildren, who were her only heirs and next of kin. She died at the home of the defendant on February 14th, 1936.
The defendant, who was engaged in the real estate business, had, for a number of years, managed, or arranged, realty *Page 82 
deals in which Mrs. Murphy had been interested. She was reputed to have acquired, largely through those transactions, an estate of approximately $40,000. That estate, before her death, had shrunk to approximately $20,000. Paragraph 3 of the complaint says that when she was persuaded to take up her residence in the home of the defendant, her estate consisted of ninety-two shares of eight per cent. preferred stock of the Public Service Corporation of New Jersey, valued at about $13,000; a bond and mortgage for $3,500 on property owned by the defendant located at No. 300 Hoboken avenue, Jersey City; a bond and mortgage for $800 on property or real estate located at No. 350 Manhattan avenue, Jersey City; and cash in the sum of about $1,100; some jewelry and furniture.
The complainant alleges that during the decedent's stay at the defendant's home, he obtained from her various valuable properties, among them being twenty-five shares of Public Service Corporation of New Jersey eight per cent. preferred stock of an approximate value of $3,750, and a cancellation of the $3,500 mortgage on the defendant's property at No. 300 Hoboken avenue, Jersey City. She seeks a discovery of conveyances, gifts, assignments, deeds and other transfers alleged to have been made by the decedent to the defendant; a return of the twenty-five shares of Public Service Corporation stock, or its equivalent in value; and a return of the bond and mortgage of $3,500, and the voiding and setting aside of the cancellation of that mortgage.
The testimony shows that the defendant, with his housekeeper, Edith Haight, on or about the 3d day of November, 1935, called to see the decedent at the Long Branch, New Jersey, home of her son, Frank. They were admitted to the home by Frank's wife. Mrs. Murphy, at the time, appeared, according to the testimony of Micucci and Mrs. Haight, to be in a state of excitement and was weeping. They stated, she said to Micucci, "God answered my prayers — you came here. * * * Take me out of this hell hole." They testified they, afterwards, talked with her son, Frank, at the Elks Club in Red Bank; and in the course of that conversation *Page 83 
he declared "I don't want her in the house — you will have your hands full." And that "when you take her out of here, I will throw the key into the ocean." The following week, the defendant called at the Long Branch home and took the decedent from there and brought her to his home in Jersey City. Mrs. Haight said that within a week thereafter, while she (Mrs. Haight) was preparing luncheon, the decedent requested her to communicate with the defendant at his office and direct him to bring, at the lunch hour, her papers or securities, which he had in his office, in his care and custody. Mrs. Haight conveyed that message. At the luncheon hour, the defendant handed Mrs. Murphy two envelopes containing the desired papers. It is alleged she examined the papers therein and then said: "Nick, this is for what you have done for me — you will never regret what you have done for me." She thereupon handed Micucci the twenty-five shares of Public Service Corporation stock and a $3,500 mortgage which she held on his real estate. He then told her the mortgage "will have to be canceled." She replied: "I don't know what to do." Whereupon, he telephoned to his office and there spoke with his secretary, a Miss Roche. She, shortly thereafter, appeared at the defendant's home in the company of William Annette, who was also employed in the defendant's office. Miss Roche then, in the Micucci home, typed a cancellation on the mortgage and handed it to the decedent and said to her: "Do you know what you are doing?" To which she replied: "Yes." Mrs. Haight, Annette, and the defendant declare Mrs. Murphy thereupon signed the typed cancellation. Miss Roche died before the hearing herein and, therefore, we are without the benefit of her testimony as to what then and there happened.
The mortgage was not produced at the hearing; consequently, it is not in evidence. There is testimony on the part of the defense that Miss Roche "stamped" the notary public seal upon the cancellation; but there is no evidence that the decedent's signature to it was either witnessed, or certified to, by anyone. The bond, accompanying the mortgage, was offered and received in evidence. Mrs. Haight, *Page 84 
Annette, and the defendant testified that the decedent not only signed a cancellation of the mortgage, but she, at the same time, handed the twenty-five shares of Public Service Corporation preferred stock to the defendant. They allege that she took the stock, and the bond and mortgage, from among the papers which had been handed to her by Micucci. Micucci testified that he, for a number of years, had been the custodian of the bond and mortgage and the stock; that he acted as such at the decedent's request. He said that for a period of years, he had collected the interest due her on her investments; and, also, the rentals from her properties; all of which he had deposited for her in her bank account. He, also, kept in his possession her bank books. He said the decedent generally consulted him about her business affairs and sought his advice thereon.
Within a few days after the decedent went to live in the defendant's home, or in the early part of November, 1935, she was there taken ill and continued ill until her death on February 14th, 1936. The defendant summoned a doctor to attend her. He attended her throughout her illness, and up to the time of her death. The doctor testified for the defendant. As to the stock and mortgage transactions of the decedent, he was asked this question: "Doctor, did this lady understand the nature and consequences of her acts?" He replied: "Undoubtedly." It appears that the doctor may either have had doubts about the decedent's mental stability at the time of the stock and mortgage transactions, or he wanted medical support, or corroboration of testimony he anticipated giving, if her acts were ever legally questioned, because he seemed to take "time by the forelock" and called another doctor, a psychiatrist, to examine the decedent as to her mental competency. The psychiatrist testified on behalf of the defendant, and said that at the time of the stock and mortgage transactions, the decedent was mentally healthy and understood the nature and quality of her said acts. To me, it seems quite significant that such unusual and elaborate preparations were undertaken in the defendant's behalf to assure him security in his disputed title by supplying him *Page 85 
with testimony of the donor's mental qualifications. Why were these mental examinations required? The defense, in my opinion, bears all the earmarks of a studied, well thought-out plan to make the transactions "attack proof." Those preparations suggest inferences that are not entirely credible.
The approximate value of the transfers from the decedent to the defendant was $7,100.
There is further testimony by the defense that the decedent said that because of the defendant's kindness to her, she was going to make him the sole beneficiary under her will. Mrs. Haight corroborated the testimony of the defendant to this effect. The conversation on that matter first arose before the decedent left her son's home; and it subsequently was mentioned in the defendant's home.
Shortly after the decedent took up her residence in the defendant's home, he, the defendant, 'phoned to Edward Burr, an attorney, with offices in Jersey City, to come to his home and see the decedent about preparing her will. In response to the message, Burr called. He prepared no will for the decedent. She died several months later without executing such a document or giving Burr any instructions or directions for its preparation.
The mortgage allegedly signed for cancellation by the decedent, was canceled the day of the decedent's funeral. The shares of stock, the defendant sold a month, or two, before the decedent's death. He retained the cash realized through the sale.
Mrs. Haight testified that in addition to her duties as housekeeper, she also devoted needed attention to the decedent during all the nights of decedent's illness. A trained nurse was engaged to attend the decedent during the daytime. The nurse's bill for services was paid either by the decedent, or by her administratrix. Mrs. Haight said the decedent was a "hard * * * dirty patient," and required frequent attention. She had to be bathed often; and her clothing and bedding was continually being soiled and had to be changed quite often. The defendant filed with the administratrix of the decedent's estate, a claim for decedent's board, which he *Page 86 
estimated to be worth $25 a week. He charged her for the cost of wiring her bedroom, to enable her to signal the housekeeper. He also claimed the sum of $5 a day for feeding the nurse. Mrs. Haight also presented a claim for services which she estimated to be worth $25 a week. She received $10 weekly for her services as housekeeper for the defendant. The sum total of the claims of the defendant, and Mrs. Haight, amount to approximately $1,300 for the period of the three months stay of the decedent in the defendant's home, or the approximate sum of $100 a week, exclusive of the nurse's bill. These estimated expenses charged by the defendant against the decedent are not calculated in my opinion to sustain the reputation "for kindnesses" which the decedent is alleged to have entertained for the defendant. For what she received from the defendant, she, evidently, paid. It is to be observed that the defendant not only asked for the payment of his claim for decedent's board, c., but, through his counter-claim, he wanted her entire estate — everything she possessed.
I was not at all impressed with the testimony of the defendant and his witnesses. The story of the transfers of the stock, and bond and the mortgage cancellation, emanates from interested sources — wholly from the testimony of the defendant and his associates in business. It is significant that out of ninety-two shares of Public Service Corporation eight per cent. preferred stock, which the decedent owned, that the twenty-five shares allegedly transferred to the defendant, were the only shares in the group that had borne the blank endorsement of the decedent. The evidence is to the effect that they were endorsed approximately ten years before the decedent's death, when they were given by her to the First National Bank of Jersey City as security for a loan, which she obtained from it. It is to be recalled that those certificates of stock endorsed in blank, were in the care and possession of the defendant for a long time prior to their alleged transfer to him.
There was no evidence to indicate that the decedent at any time during her twenty years of business relations with the defendant, evidenced an attitude of appreciation toward him *Page 87 
for the alleged kindnesses he declared she said he had shown her. There is testimony indicating that she was not generous and given to beneficence. Her disposition was to acquire wealth, rather than to distribute it. There is evidence to the effect that she would argue with the defendant over charges or commissions he made through her ventures. There were occasions when she refused to pay the amount of his charges and she, on the contrary, gave him less than he asked.
It is the contention of the complainant's counsel that the signature on the cancellation was fraudulent; that it was not that of the decedent. It seems singular to me that the bond accompanying the mortgage was offered and received in evidence, while the mortgage was not. Its absence from the record is significant. It was stated by the defense, that the mortgage could not be located. A further important fact is, while the alleged cancellation was dated November 14th, 1935, the mortgage was not presented for cancellation until the day of the funeral of the decedent. There is no evidence that the signature to the endorsed cancellation was authenticated and verified as the law requires. The evidence, as hereinabove stated, is to the effect that no one but the decedent signed the cancellation. The defendant's secretary, Miss Roche, merely attached the notary's seal to the cancellation. The decedent had held the Micucci mortgage since the year 1929, and regularly collected from the defendant the interest due thereunder.
The defendant filed a counter-claim in which he alleged that he was entitled to all of the decedent's estate by virtue of a promise he made to the decedent to take care of her during the period of her life, in consequence of which she promised to leave him, at the time of her death, her entire estate. At the close of the hearing the defendant withdrew the counter-claim.
The decedent was aged and ill. She had no independent legal advice. Those who ministered to her were furnished or procured by the defendant. No member of her family appears to have received notice of her illness until a late hour on the night of her death. She died, as it were, among strangers, *Page 88 
some of whom hoped, or expected, to acquire her entire estate, or be the object of her bounty. The last few months of this aged woman's life was surrounded with an atmosphere of suspicious acts and doubtful circumstances which a court of conscience will not ignore, and cannot sustain.
There is a long line of cases in this state dealing with the points involved in these proceedings, many of which it does not seem necessary to recite; but it may not be out of order to call attention to a few of them. Chief-Justice Gummere, speaking for the court of errors and appeals, in Slack v. Rees, 66 N.J. Eq. 447,
therein quoted from Haydock v. Haydock's Ex'rs, 34 N.J. Eq. 570,575, the following: "Where parties hold positions in which one is more or less dependent upon the other, courts of equity hold that the weaker party must be protected, and they set aside his gifts if he had not proper advice, independently of the other." That rule then and there enunciated is the law to-day.Sanderson v. Howell, 14 N.J. Mis. R. 61; 182 Atl. Rep. 158.
In Madison Trust Co. v. Allen, 105 N.J. Eq. 230, the principle was established that where the only witness to an alleged gift is the wife of the donee, it is proper to consider the surrounding circumstances, personal interest, and the actions of the claimant at, or immediately subsequent, to the time of the alleged gift. In considering the instant case, that observation of the court was borne in mind. Hudson Trust Co. v. Murphy,13 N.J. Mis. R. 375; 178 Atl. Rep. 366; Christian v. Canfield,108 N.J. Eq. 547.
There is no doubt in my mind that the defendant, Micucci, who is very much younger than the decedent, at the time of her death occupied a confidential relationship toward the decedent. He, in my opinion, was the dominant party, while the decedent was the subordinate, or weaker party. Her physical condition, was one of infirmity and wracked by, not only old age, but by the ravages of disease. In Christian v. Canfield, supra, Vice-Chancellor Berry, among other things, said:
"The relation of physician [healer] and patient was a confidential one; and the fact that since the death of the *Page 89 
decedent's brother in May, 1934, Mrs. Canfield had entire charge and supervision of the decedent's financial affairs, did all of her banking business for her, had exclusive access to her safe deposit box, and, in general, assumed complete control of her affairs, created the fiduciary relation."
The details of relationship described in this quotation from Christian v. Canfield, appear, to a large extent, to be present in the instant case.
In In re Fulper, 99 N.J. Eq. 293, Vice-Chancellor Buchanan said:
"The rule apparently to be deduced, * * * is that a transfer which would be deemed improvident if there were no consideration, is not saved from being improvident by a mere verbal promise to support for life.
"The proof as to competent, independent advice, where such proof is requisite, must be that such advice was actually given to the transferor. Pearce v. Stines, 79 N.J. Eq. 51;80 Atl. Rep. 941; Kelso v. Kelso, 96 N.J. Eq. 354 (at p. 357);124 Atl. Rep. 763; 33 A.L.R. 587; Graziano v. Lanuto, 97 N.J. Eq. 182; 127 Atl. Rep. 109."
Regardless of the feeling which the defense alleges the decedent entertained for her children, or any want of affection or respect which the children may have entertained toward the decedent, is no reason why those children should be deprived of their legal rights or interests in the estate of their mother. Vice-Chancellor Berry, in Christian v. Canfield, supra, said:
"Although advanced as an argument on behalf of the defendant, we are not here concerned with the decedent's treatment by her relatives prior to her death. If that treatment did not merit the reward which will be theirs if this estate is distributed among them, the answer is that they are not here asserting their moral, but their legal, rights. It may be that the defendant is more deserving of financial reward in recognition of her service as friend and healer, but it must not be overlooked that she was a professional `healer' and was paid for her services at regular stated intervals during the entire period of her treatment which continued for *Page 90 
over five years. The law recognizes no claim against the estate upon moral grounds, nor does it refuse to recognize a legal claim because, perchance, the legal claimant did not discharge his entire moral obligation. It is to be assumed that if the decedent desired to subtract from her relatives' legal rights she would have availed herself of her privilege to dispose of her estate by will."
The law imposes upon the donee, the defendant herein, the burden of establishing by clear, cogent, definite, certain and convincing evidence, the bona fides of the alleged gifts; but I feel that the evidence supplied by him to sustain that burden is neither clear, definite, certain, nor convincing. Wright v.Sanger, 101 N.J. Eq. 203. Therefore, I feel constrained to advise a decree granting the prayer for relief as requested in the bill filed herein.