By his bill of complaint filed May 17th, 1940, complainant sought to have declared void a conveyance of his Winans Avenue property made by him to defendant (his wife) and also his transfer to her of title to an automobile. The cause came on for hearings before me which were concluded March 20th, 1941, and decision was reserved awaiting briefs to be filed on behalf of the parties. The complainant met an accidental death April 15th, 1941, before any brief filed or decision rendered and the cause lay dormant until October 11th, 1943, when an order was entered reviving the suit in the name of complainant's children as his heirs-at-law and next of kin, the petition for the order alleging that complainant had died intestate and that neither letters testamentary nor of *Page 17 
administration had been granted on his estate. Counsel for the parties have agreed to submit the revived cause on the pleadings, the record of the hearings and briefs of counsel, which briefs have finally been filed. For convenience I shall refer to the deceased complainant as the complainant.
The complainant was a member of a Widows and Widowers League and defendant was a member of a similar organization, the main object of both leagues being matrimony, and they met October, 1937. He was then about seventy years of age, and had been previously married forty-one years, had four adult children and had been a widower since April, 1937, and was a collector for an installment furniture house. She was about fifty-five years old, had been previously married twenty-three years, had no children, had been a widow ten years, had had some business experience as a public stenographer and lived with her sister. Complainant considered her a matrimonial prospect and proceeded to call on her and during the subsequent weeks of their social intercourse they exchanged confidences as to their financial status. He informed her that as a collector for an installment house and through some minor sources, he had an income of $50 per week, had a bank account, owned building and loan shares, an automobile and a dwelling house, all of which was true, and she testified that those disclosures were an important factor in her subsequent decision to marry him. She further testified that then and up to the time of her marriage she had no income, except a small amount earned as a sort of secretary for the League of which she was a member and that she was dependent for support on the sister with whom she lived. Notwithstanding that such was actually her financial condition she had informed complainant that she had an interest in a large estate in England from which she would shortly receive a substantial sum of money. I find from the preponderance of the evidence, notwithstanding her sworn denial, that she did so falsely lead complainant to believe that she was a woman of considerable wealth and I have no doubt that such belief accelerated complainant's matrimonial inclinations toward her. She testified that on February 22d 1938, he proposed marriage and that after two days' consideration *Page 18 
she informed him of her acceptance. He testified he did not want to be precipitate about marriage and preferred to wait until his first wife had been dead a year, but she testified that three days before they were married he came to her in great excitement and asked her to save him from a wealthy widow who insisted on marrying him and who had locked him in her room a whole day and offered him as a marriage inducement a new automobile and the management of her property in Asbury Park; that at complainant's urging they that day secured a license to marry. It also appears from the testimony that about this same time complainant's daughter-in-law called defendant on the telephone and told defendant not to bother complainant any more because he was not responsible for some of the things he said and not to take him too seriously. I think it was because of that telephone conversation which threatened interference from his family with his marriage (or perhaps her fear that the "wealthy widow" might get him), that the wedding date was hastened.
They were married March 10th, 1938, without the knowledge of complainant's children. Just prior to the marriage she went with him to his bank where he drew out his entire balance of $15.46 which he testified he gave her but which she testified he kept. The day they were married they went to a broker to whom he sold some of his building and loan shares for $400, and a week later they went to the same or another broker to whom he sold the remainder of such shares for $340, which total sum of $740 he immediately gave defendant. She testified she returned $50 to complainant but he denied receiving it. Immediately upon marriage she expressed her intention to move to an apartment in his Winans Avenue house — a two and one-half story dwelling — which apartment was then occupied by a son of his and she gave complainant $100 to give to his son for moving expenses and to pay rent elsewhere. The apartment consisted of two bedrooms, a living room, bath and kitchen. At her insistence extensive alterations and repairs were made to the apartment for which she testified she paid out of the money complainant had given her and she purchased $600 worth of furniture on *Page 19 
the installment plan. He owned a Chevrolet car, 1931 model, purchased in 1935 for use in his business. He transferred it to her within a year after marriage and she soon exchanged it for a 1937 Ford car at the exchange price of $350, turning in the old car, paying $100 down and agreeing to pay the balance in installments. He gave her all his earnings out of which she returned $2 or $3 per week for his personal use and used the balance for household expenses and for installment payments on the furniture and the Ford car. He thus had no assets left other than his Winans Avenue house on which there was a mortgage and arrears of taxes. Within five or six months after the marriage she went with him to a lawyer's office where he executed a will leaving all his property to her and gave her the will.
Trouble started almost immediately after marriage. She testified that two or three days after their wedding she saw him take money from her pocketbook and thereupon became sorry for what she had done and felt she could not trust him. But the real trouble commenced in July or August, 1938. She objected to and restricted his smoking in their rooms, criticised his personal habits about the house, found fault with his table manners and tried to correct him in those and other particulars, all of which displeased him and which he resented. He testified that she dominated and threatened him because he was unable to break off the habits he had contracted in the free years of his previous marriage. In addition she was dissatisfied with his earnings. As a result of her attempts to reform him he sulked and was silent for days and their life together was unpleasant and unhappy. The Winans Avenue house became a subject of discussion. While she admits talks about the house, it does not appear that she specifically urged complainant to convey it to her but she did call his attention to the fact that she was not protected in any way and had "no roof over her head." He testified that when she talked about the house he said he would give it to her if she would leave him alone and stop scolding him. Shortly before Christmas of 1938 he told her he was going to give her a present, without telling her what it was, and at Christmas he said the gift was not ready. Without her knowledge *Page 20 
he went to a lawyer of his own choosing, taking with him his title deed for the house, and told the lawyer to draw a deed to defendant. The lawyer drew the deed and subsequently complainant called at the lawyer's office and executed it and told the lawyer to record it. The deed was dated, acknowledged and recorded December 30th, 1938. Early in February, 1939, complainant obtained the recorded deed from the lawyer and gave it to defendant saying, "Here. Now leave me alone. Here is a Christmas present." He had not discussed with any one his intention to execute the deed and he did not ask for advice from the lawyer who drew it and received none from him or from any one as to what consequences might result from his act.
He lost his job November, 1939, and was unsuccessful in obtaining another, hence he was bringing no money to defendant after that date. He lived in the house until March, 1940, when she changed the lock on the door and thereafter he was forced to live with a son. She testified he had been abusive in language and manner toward her and had threatened her (all of which he denied) and that she locked him out because he stayed away much of the time. She put his clothes in a trunk and set it out in the hall, where he subsequently got it after a lawyer acting in his behalf demanded that defendant surrender complainant's personal belongings. At the age of seventy-one or seventy-two he had nothing left of the assets he had possessed two years before at the time of his marriage and he had no home to call his own.
I give no consideration to complainant's claim to the Ford automobile, mainly because when it was acquired by the defendant in 1939 it was a used 1937 model valued at $350 for the purpose of the trade through which it was acquired. It could be of little value now and if it is still in defendant's possession it is because she has made the installment payments on it since at least March, 1940. The only question I feel called upon to determine is whether complainant is entitled in equity to relief as against his conveyance to defendant of his Winans Avenue house.
Defendant had become a member of an organization the chief aim of which was to bring together widows and widowers *Page 21 
who were seeking another venture in matrimony. Complainant appeared on the scene but he was so different from defendant in type, characteristics and education that I cannot believe she married him because of affection, or even for companionship. She was fifty-five years old and had been a widow ten years. With each passing year her chance of securing a husband grew less and complainant was perhaps her last opportunity. I believe that complainant's brief courtship was pressed by defendant to a speedy marriage so that she might secure for herself a home, support and the benefits to be derived from complainant's property. The evidence shows that in the courtship and throughout their marital association she had the stronger mind and was the dominant party. Her treatment of complainant beginning almost immediately after marriage, her prompt attempt to put into effect rules for the regulation of his conduct in their home and of his personal habits (with which he was expected to comply notwithstanding his protests), are evidence that she intended to be the boss of the household and soon his life with her was made uncomfortable and unhappy. She promptly took over all of complainant's assets except his house and saw to it that she was assured by his will (to the execution of which she was a party at least to the extent of being in attendance at the lawyer's office when it was drawn and executed) that in the normal expectancy of life she would soon obtain his real property also. But she could not wait for that time to arrive. She discussed with him on various occasions her desire to become the owner of his house and he was unable to resist, as he had been unable to resist her acquisition of all his personal property and her expenditure of his money in excess of his financial means in remodeling and refurnishing their living apartment. I believe he would not have thought of giving her his deed had she not suggested it and that her conduct toward and her treatment of him was a coercive influence which resulted in its execution and delivery to her. The consideration for it was certainly not love and affection. Upset in mind as he was, he probably thought that the gift to her of the last thing he possessed would bring family peace and that he still would have the right, as husband of *Page 22 
the owner, to a comfortable home. For a year after the conveyance he was permitted to live in the house. The loss of his job, his inability to bring in any more money (she then had the rent of the two other floors of the house) and her continued and expressed distaste for him resulted in her revocation of that permission and in his eviction. She coldly turned him out to the charity of his children.
Where the validity of a gift by way of conveyance whereby the grantor stripped himself of all his property is in question, it appears that in the relation between the grantor and grantee the latter had acquired a dominant position, the burden is on the grantee to prove that the grantor fully understood not only the nature of his act but also the consequences which would result to him therefrom. The indispensable evidence of such understanding is that the grantor had competent independent advice as to the effect and consequences of his act. Even if the execution by complainant of the deed here in question was not the result of undue influence exerted by defendant over complainant, the conveyance must be set aside because it appears that in the relationship between complainant and defendant, as it existed at the time of its execution, the parties were not living on terms of equality but that the defendant occupied the dominant position. The conveyance was an improvident act on complainant's part in that thereby he stripped himself of all his remaining property and in executing and delivering it to defendant he acted without any advice whatever as to the consequences that might and did result to him therefrom. (Slack v. Rees, 66 N.J. Eq. 447;Albert v. Haeberly, 68 N.J. Eq. 664; Post v. Hagan, 71 N.J. Eq. 234; Alberts v. Alberts, 119 N.J. Eq. 391; Crowther v.Micucci, 122 N.J. Eq. 81; affirmed, 123 N.J. Eq. 164; Croker v.Clegg, 123 N.J. Eq. 332.)
I am not unmindful of the testimony that complainant had executed a will in favor of defendant under which he gave her all his property. By virtue of that will, if it exists unrevoked, she may acquire title to the Winans Avenue property. However that may be, my sole duty is to determine the issue raised by the pleadings. *Page 23